# IN THE COURT OF APPEALS OF IOWA

No. 24-0950
Filed August 7, 2024

**IN THE INTEREST OF J.A.,**
**Minor Child,**

**J.S., Father,**
    Appellant,

**S.A., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Fremont County, Scott Strait, Judge.

Parents separately appeal the termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**

Oluseyi O. Olowolafe of Olowolafe Law Firm, Papillion, Nebraska, for appellant father.

Eric A. Checketts of Checketts Law, PLC, Glenwood, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Whitney Estwick, Omaha, Nebraska, attorney and guardian ad litem for minor child.

Considered by Greer, P.J., and Ahlers and Badding, JJ.

**BADDING, Judge.**

In the six months before the termination hearing, the parents of four-year-old J.A. had stopped participating in almost all the services that were offered to them. The juvenile court accordingly terminated their parental rights under Iowa Code section 232.116(1)(e) (2024). Both parents appeal, challenging the statutory ground for termination, the sufficiency of reunification efforts, and whether termination is in the child's best interest. We affirm.

## I.      Background Facts and Proceedings

J.A. was born in 2020. He and his three half-siblings, who are not involved in this appeal, first came to the attention of the Iowa Department of Health and Human Services in April 2021 when one of the children ingested the mother's medication. While investigating that incident, the department became concerned about the poor condition of the family home. The mother and her children were evicted from their home in June, setting off a string of moves in the months that followed.

After the mother sought emergency treatment in September for suicidal thoughts, the State petitioned to have J.A. adjudicated as a child in need of assistance. The mother had provided the department with the identity of J.A.'s father, but because his whereabouts were unknown, he was served with notice of the proceedings through publication. The children were placed with the paternal grandparents of two of J.A.'s siblings, more than three hours away from the

mother's residence.[1]  The children were formally removed and adjudicated in need of assistance in January 2022.  The father's paternity was not confirmed through DNA testing until the following year.

Over the course of that next year, the mother's housing and transportation remained unstable.  She moved constantly—either because of evictions or unstable relationships—eventually landing in a town four hours away from the children.  Despite service providers repeatedly telling the mother that she had to find appropriate housing for her and the children, she made no effort to do so.  The mother's moves made visitation challenging, as did her distance from the children's placement and lack of transportation.  When the mother did attend visits, she struggled to engage with the children and address their needs.   And, despite the mother's ongoing mental-health issues, she did not obtain a mental-health evaluation as ordered.

The father came forward in January 2023, after being released from prison several months before.  He likewise lived several hours away from J.A.  While a permanency hearing was scheduled for later that month, the department recommended an extension to give the mother more time to secure stable housing and allow the father to undergo DNA testing, participate in services, and establish a relationship with J.A.  By the continued permanency hearing in February, the mother was attending visits with J.A. every other weekend—but she had plans to

---

[1] While the proceeding was initiated in Webster County, venue was changed in July 2022 to the county where the children were placed due to the mother's frequent moves.

move yet again. The father had only minimally participated in services and had yet to undergo DNA testing.

Things were not much better for the mother by the permanency-review hearing in May. While the mother reported that she was participating in mental-health services, she had cancelled several appointments, eventually discontinuing therapy altogether. The mother had also moved again, although not to a suitable residence for all the children. But the father had started seeing J.A. in person and building a relationship with him. So the department recommended another extension of time. The parents were offered in-person visits with J.A. every other week, but both canceled visits over the next few months. The mother was also offered virtual visits with J.A., but she ended those in July. After receiving a report from the father's parole officer, the department recommended that he obtain a mental-health evaluation and start drug testing. While the father's attendance at visits improved by August, he told the department that he was using marijuana daily to help with his anxiety and PTSD.

By December, the mother had moved in with a new boyfriend and had not seen J.A. in person or virtually for several months. The father's attendance at visits was also inconsistent and sparse. Of the visits he did attend, he was almost always late and always unprepared. The father completed a mental-health evaluation, but he did not follow through with recommended treatment. He had also tested positive for methamphetamine and amphetamines. And the department learned that law enforcement had been called to the father's home eight times in three months because of his mental health, intoxication, and verbal abuse of his wife. Given both parents' lack of progress, the department

recommended changing the permanency goal to termination. The State filed its termination petition in January 2024. Around the same time, the father obtained a substance-use evaluation, but he did not follow through with recommended treatment. Later the same month, the father was charged with domestic abuse assault, resulting in a no-contact order between him and his wife. Since his wife was his transportation for visits, the father stopped attending them altogether.

A termination hearing was held in March. By then, the mother had gone roughly five months without seeing J.A., and the father nearly three months. The department caseworker testified, "there's just no bond between either parent and the child." In its termination ruling, the juvenile court found that neither parent made significant progress toward reunification, both failed to comply with court-ordered services, and neither had maintained significant and meaningful contact with the child or made efforts to resume care of him. So the court terminated the parents' rights under section 232.116(1)(e) and found termination was in the child's best interest. The mother and father each appeal.

## II. Analysis

We review terminations of parental rights de novo, asking whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022); *see also* Iowa Code § 232.116(1)–(3). The parents' appeals touch on each of these steps.

Starting with the first step, both parents challenge the sufficiency of evidence supporting the third element of Iowa Code section 232.116(1)(e). That element requires a showing by "clear and convincing evidence that the parents

have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so." Iowa Code § 232.116(1)(e)(3). The provision then explains that

> "significant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life.

*Id.*

Both parents argue they maintained significant and meaningful contact to the extent that they were able given the obstacles that were in their way. The father highlights his late involvement in the case, distance from the child's placement, and lack of transportation. The mother only references her "extreme indigence." Still, the fact remains that the parents had little contact with the child in the six months before the termination hearing. The mother was offered services and visitation for more than two years, while the father was offered the same for about a year after his paternity was confirmed. But neither consistently attended in-person visits, even though they were only once every two weeks. By the termination hearing, it had been months since the parents had seen the child—five months for the mother and three months for the father. They also failed to affirmatively assume parental duties by providing financial assistance, abiding by the case permanency plan, otherwise communicating with the child, or establishing a place of importance in his life. The parents' contact with the child cannot be

described as significant and meaningful under the statute. So we conclude the State met its burden to show a lack of significant and meaningful contact by both parents sufficient for termination under section 232.116(1)(e).

Both parents also seem to suggest that they were not provided reasonable efforts at reunification. But that challenge must be made when services are offered, *In re C.D.*, 508 N.W.2d 97, 101 (Iowa Ct. App. 1993), and any objections or complaints must be brought to the juvenile court, *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002). The record shows that didn't happen here, at least in a timely fashion. It appears that only the father complained about the sufficiency of services, but he did not do so until his testimony at the termination hearing and a post-hearing motion, which was too late to preserve error. *See In re A.A.G.*, 708 N.W.2d 85, 91 (Iowa Ct. App. 1995). We do not consider this issue further.

Turning to the second step, both parents passively argue termination is not in the child's best interests. When considering whether termination is in a child's best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). Neither parent addresses how these factors weigh against termination. The father does point to his efforts to bond with the child, but "[c]onsideration of the parent-child bond is not part of our best-interests analysis." *In re E.S.*, No. 23-0590, 2023 WL 4104126, at *2 (Iowa Ct. App. June 21, 2023). If the father is asking us to apply the permissive bond exception to termination in section 232.116(3)(c)—which authorizes the court to forgo termination when it "would be detrimental to the child . . . due to the closeness of the parent-child

relationship"—we conclude the exception does not apply, as the father presented no evidence that the child would suffer physically, mentally, or emotionally upon termination. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) ("[T]he parent resisting termination bears the burden to establish an exception."). As for the mother, she generally claims termination is not in the child's best interests because the court could have applied any of the permissive exceptions to termination in section 232.116(3) "to save the parent-child relationship." We summarily conclude that none of the exceptions apply to the mother. The mother also claims "[a] child's best interest is served by being in the care of his biological mother." That may be true when the mother is suitable, but the State proved that wasn't the case here. We agree with the juvenile court that termination is in the child's best interests.

## III.    Conclusion

We affirm the termination of both parents' rights.[2]

**AFFIRMED ON BOTH APPEALS.**

---

[2] To the extent that either parent requests more time for reunification, that issue was neither raised in or decided by the juvenile court and is therefore not preserved. *See, e.g.*, *See State v. Bauler*, ___ N.W.3d ___, ___, 2024 WL 3209908, at *12–13 (Iowa 2024). Even if error had been preserved, neither parent has enumerated what specific factors, conditions, or expected behavioral changes will alleviate the need for removal at the end of an extension. *See* Iowa Code § 232.104(2)(b). On this record, we cannot do so either and therefore conclude an extension of time is unwarranted.